RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0402P (6th Cir.)
File Name: 02a0402p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RHETT GILBERT DEPEW,
     *Petitioner-Appellee/*
     *Cross-Appellant,*

    *v.*

CARL S. ANDERSON, Warden,
     *Respondent-Appellant/*
     *Cross-Appellee.*

Nos. 00-3513/3517

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 94-00459—Walter H. Rice, Chief District Judge.

Argued: May 1, 2002

Decided and Filed: November 20, 2002

Before: MERRITT, BATCHELDER, and GILMAN,
Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles L. Wille, ATTORNEY GENERAL'S
OFFICE OF OHIO, Columbus, Ohio, for Appellant. Gary W.
Crim, Dayton, Ohio, for Appellee. **ON BRIEF:** Charles L.
Wille, ATTORNEY GENERAL'S OFFICE OF OHIO,

Columbus, Ohio, for Appellant.  Gary W. Crim, Dayton, Ohio, David P. Williamson, BIESER, GREER & LANDIS, Dayton, Ohio, for Appellee.

MERRITT, J., delivered the opinion of the court, in which GILMAN, J., joined.  BATCHELDER, J. (pp. 20-29), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

MERRITT, Circuit Judge.  This is an Ohio death penalty case in which the district court has issued a writ of habeas corpus because there was constitutional error in the sentencing phase of the trial.  In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court found Ohio's death penalty scheme unconstitutional because it restricted consideration of constitutionally relevant mitigating factors.  In this case, the question is whether an Ohio prosecutor's repeated inadmissible comments at sentencing effectively precluded the jury's consideration of the defendant's sole mitigating circumstance in violation of the Eighth Amendment and constituted an unconstitutional comment on the defendant's failure to testify.  The Supreme Court of Ohio roundly condemned the prosecutor's conduct as follows:

> [T]he prosecutor in this case openly declared at a pretrial hearing that he did not care whether appellant received fair treatment.  Later the prosecutor informed the jury of an alleged knife fight, which was not in evidence, and implied thereby that appellant was guilty of wrongdoing, of which there was absolutely no evidence.  Further, the prosecutor commented to the jury on a subsequent conviction of appellant, unsupported by any evidence in the record, and then [after being admonished by the trial judge, who had previously warned against mention of such] told the jury that no such conviction existed.  The prosecutor then exhibited and commented on a totally irrelevant photograph depicting appellant next to a

marijuana plant. Further, the prosecutor, in his closing remarks at the penalty stage, told the jury that "[i]t's not necessarily true that if you get three counts of twenty to life that it will add up to sixty -- that's not necessarily true." While this does not involve a *total* misstatement of the law (see R.C. 2967.13[D] and [E]), it certainly could be construed as misleading.

*State v. DePew*, 38 Ohio St. 3d 275, 288, 528 N.E.2d 542, 556 (1988), *cert. denied*, 489 U.S. 1042 (1989). The prosecutor also commented on the defendant's failure to take the stand and testify under oath at the sentencing hearing. On the Fifth Amendment violation, the Supreme Court of Ohio said:

Although appellant herein does not focus on the prosecutor's remarks regarding appellant's failure to make a sworn statement, we deem it appropriate at this juncture to examine the general propriety of such remarks. R.C. 2929.03(D)(1) provides in pertinent part that "[i]f the offender chooses to make a statement, he is subject to cross-examination only if he consents to make the statement under oath or affirmation." This section grants the defendant in a capital proceeding the right to make an unsworn statement at the penalty stage. To permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights and negates the defendant's statutory prerogative. However, to totally restrict the prosecutor from making *any* comment would likewise be unfair, especially where the defendant, in his unsworn statement, has offered something less than "the truth, the whole truth and nothing but the truth." Therefore, notwithstanding our previous pronouncements in *State v. Mapes* (1985), 19 Ohio St. 3d 108, 116, 19 OBR 318, 324-325, 484 N.E.2d 140, 147, we now hold that where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must

be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses. While the remarks made herein surely exceed the proper scope of comment set forth today, we find that such remarks are harmless error in light of the overwhelming weight of the aggravating circumstances in this case relative to the factors offered in mitigation, as discussed *infra.*

38 Ohio St. 3d at 284-85, 528 N.E.2d at 553-54. The Ohio Supreme Court held, however, that it would not reverse and upset the *public expectation* of capital punishment for a brutal murder:

> While all these comments, taken together or even standing alone, constitute unreasonable and unfair conduct by the prosecutor, we must balance against that conduct the admission of appellant that he brutally stabbed to death a young mother, her daughter and her younger sister and then mutilated their bodies by fire. In cases such as this, we cannot ignore the compelling interest of the public, which has every right to expect its criminal justice system to work effectively.

38 Ohio St. 3d at 288, 528 N.E.2d at 556-57. In dissent, Justice Wright disagreed with the court's conclusions:

> Although the majority opinion concedes that the prosecution indulged in misconduct during the penalty stage of the trial, it asserts -- in what has become a frequent refrain in far too many criminal cases before us -- that the errors were "harmless." Once again, the majority denounces the prosecutorial misconduct obvious in this case, but allows it to continue unheeded, permitting the state to further chip away at the right to fundamental due process and a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

38 Ohio St. 3d at 293, 528 N.E.2d at 560-61.

As both *Byrd* and *Lorraine* indicate, commentary on silence or failure to take the oath is permissible where it is a "fair response" to defense counsel's argument and strategy. *See also United States v. Robinson*, 485 U.S. 25, 32 (1988) ("Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege."); *Lockett v. Ohio*, 438 U.S. 586, 595 (1978); *Butler*, 686 F.2d at 1173 n.9.

I readily concede that there is a fine line between commenting on the unsworn nature of the defendant's statement and commenting on the defendant's failure to testify. Although the prosecution did not, as the majority opinion proclaims, "ask[] the jury to draw an adverse inference from the defendant's failure to testify," *ante*, at 13, I concede as well that the prosecutor's statements in this case crossed that line. But as both the Supreme Court and this circuit have made clear, not every comment on the failure to testify is constitutionally impermissible. In the case before us here, DePew's counsel deliberately opened the door by repeatedly drawing attention to the unsworn nature of DePew's statement, and even predicting that the prosecution would address the matter. The invitation to respond became yet more compelling when DePew's counsel repeatedly emphasized that DePew had no convictions prior to the date when he committed these murders. In light of this, and given the similarity of the facts of this case with those in *Lorraine*, I would hold that no constitutional error occurred here.

Now, the judge told you that the defendant in a case of this nature, by law, has a right to choose whether he wants to give an unsworn statement, that he did, or whether he wants to get on the witness stand. And that I suspect will be criticized by the prosecutor, because they are allowed to talk about that. But the fact of the matter is, two days ago [in the guilt phase], they argued that you convict this man on an unsworn statement; that was reliable enough. When he gave a long full statement to the police, he wasn't under oath. And now he comes to you and gives you the same opportunity to hear him. No, he wasn't under oath, but the issue isn't whether he was under oath or not, the issue is whether he was telling the truth or not, and that's for you to judge.

J.A. at 4084. The prosecutor, as predicted, did comment on DePew's failure to take the oath, mentioning as well the effect that this had on the prosecutor's ability to cross-examine him:

[T]he gentleman for the defendant, he told you five different times about the oath you took, and about the oath we all take, and the oath I take, and the oath you take—everybody takes the oath except the defendant; he isn't man enough to get up here and take the oath. Everybody in this case took the oath. Everybody in this case raised his right hand to this man, and he says I solemnly swear to tell the truth, the whole truth and nothing but the truth so help me God. Everybody except DePew. He wanted to read his, and when he read it he wasn't even man enough to look at you. And when he looked up, he wasn't even man enough to look at you.

He wouldn't sit in that chair because then he would have to answer my questions. And then I would ask him if he's ever been convicted of a criminal offense after the date in question in this case. And I would have . . . .

J.A. at 4121–22. DePew's counsel then objected to the mention of the prior conviction, though not to the commentary on the unsworn nature of DePew's statement.

---

Because we agree with the district court below and Ohio's Justice Wright that constitutional errors may not be swept under the rug because of public expectations or the pretext of harmless error, we conclude that the prosecutor's conduct violated the defendant's Eighth Amendment right to an individualized jury determination and his Fifth Amendment right not to testify and to remain silent. We therefore REMAND for a new sentencing hearing.

## I.  Background

Late in the evening of November 23, 1984, Tony Jones returned home to find his house on fire. Firefighters later discovered the bodies of his twenty-seven year old wife Theresa Jones, their seven-year- old daughter Aubrey, and Theresa's twelve year-old sister Elizabeth Burton inside the house. The autopsies showed that Theresa had died from more than fourteen stab wounds; Aubrey had died as the result of twenty-one stab wounds; and Elizabeth had died from a combination of five stab wounds, burns, and carbon monoxide poisoning.

On April 3, 1985, police detective Rick Sizemore questioned Deborah Sowers, the defendant's girlfriend, about the homicides. During the course of the interview, Sowers implicated the defendant, Rhett DePew. Based on this information, Sizemore and detective Joe Rooks found the defendant and arrested him on an outstanding, unrelated warrant. The defendant was transported to the prosecuting attorney's office in Hamilton, Ohio, where he was questioned about the murders for several hours. The defendant eventually confessed to the murders.

According to the defendant's confession, he and Sowers drove to the Jones residence, where the defendant had previously lived as a tenant, to "get some money." Armed with a large knife and believing the house to be empty, the defendant entered through the back door and began searching the house. As he approached a bedroom, he was confronted by the victims, who began screaming. The defendant then "freaked out" and "just started swinging" with his knife,

stabbing each of the victims repeatedly. He then set fire to some clothing in Theresa's closet. Before leaving, he discovered a baby crying in a back bedroom. He wrapped the child in a blanket and left her on the porch of the house next door. Sowers then picked the defendant up and they returned home.

The defendant was subsequently indicted on three counts of aggravated murder under Ohio Rev. Code § 2903.01(B). Each count contained three aggravating factors: the offense was committed during an aggravated burglary (§2929.04[A][7]), the offense was committed during an aggravated arson (§2929.04[A][7]), and the offense was part of a course of conduct involving the purposeful killing of two or more persons (§2929.04[A][5]). The defendant pleaded not guilty to all counts. Before trial, the defendant moved to suppress his confession and also filed a motion *in limine* to prevent Sowers from testifying against him on the basis that she was his common law wife. After a hearing, these motions were denied.

After a jury trial, the defendant was convicted of all counts. During the penalty phase of the trial, the defendant's sole mitigating theory was that he was a peaceful person who had no prior criminal offenses and had acted out of character in the heat of passion in killing the victims. To substantiate this mitigation theory, the defendant put twenty character witnesses on the stand and made, as allowed under Ohio law, an unsworn statement apologizing to the family of the victims.

At issue in this case are several inflammatory statements that the prosecutor made during the penalty phase. First, the prosecutor asked a defense witness on cross-examination, "You knew he [the defendant] got cut in a knife fight over at King Kwik, didn't you?" This statement implied that the defendant had been previously involved in a knife fight, an implication with no foundation or factual basis. Also, the prosecutor stated to the jury that any sentence less than death could result in parole, alluded to facts not in evidence, and

[mitigating personal problems], isn't it important for you to know what he had to say about that—

[DEFENDANT]:  Objection, Your Honor.

THE COURT:  Overruled.

[PROSECUTOR]:  Subject to cross examination?

THE COURT:  Overruled.

[PROSECUTOR]:  No. What was his statement to this Jury? Did he get up on this witness stand like those other witnesses? He says I'm sorry I wish it didn't happen. . . .

*Id*. at 443. The *Lorraine* court held that this did not violate the petitioner's Fifth Amendment right, because "the prosecutor's statement was basically 'a fair response to Petitioner's unsworn statement.'" *Id*. at 444 (quoting *Byrd*, 209 F.3d at 535).

In the present case DePew tempted the prosecution by emphasizing that he had no criminal convictions prior to these murders, and he made the most of the prosecution's inability to bring out his subsequent stolen property conviction. In his unsworn statement, for example, he asserted that "[i]t may not be important to you, but I've never been arrested or convicted of anything before the night this happened." J.A. at 4051. DePew's counsel also made the most of his lack of prior convictions, commenting on it five times in his closing argument at sentencing. *See* J.A. at 4066, 4077–78, 4093, 4106, 4108. In a very resourceful attempt to bolster the statement's credibility, DePew's counsel specifically commented on the fact that DePew's statement was unsworn:

If Rhett DePew hadn't told you people through both [his recorded confession] and what he told you today [in his unsworn statement], we wouldn't be here. He totally admitted it to the police and he totally admitted it to you.

there has been a constitutional violation." *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc).

This case, however, is different from most, because here the accused did make a statement to the jury, and was not "silent." By choosing to make the unsworn statement to the jury that Ohio law permitted him to make, he had the benefit of having the jury hear what he wanted them to hear, but avoided the hazards of cross-examination. The trade-off, of course, is that his statement was less credible because he did not swear that it was true, and—as the Ohio Supreme Court acknowledged, *see* 528 N.E.2d at 554—it is only fair that the prosecution be allowed to comment to some extent on this fact. *See also Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (noting that "*Griffin* prohibited comments that suggest a defendant's silence is 'evidence of *guilt*,'" but it did not disturb the traditional rule that the prosecutor may attack the defendant's credibility as a witness).

Prior to the present case, neither the Sixth Circuit, nor any other Circuit (so far as I have found), has held that commentary on the unsworn nature of a statement violated the Fifth Amendment. We have previously considered the issue, however. In *Byrd* the petitioner had made an unsworn statement, and the prosecutor had dismissed this as "shallow" because the petitioner had expressed sorrow but had not admitted his guilt. 209 F.3d at 533. We found that the comment could have violated the petitioner's Fifth Amendment right, but did not, because it "was a fair response to Petitioner's unsworn statement," and "[c]ase law permits comments that are made in response 'to the argument and strategy of defense counsel.'" *Id*. at 534–35 (quoting *Butler*, 686 F.2d at 1172).

Similarly, in *Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002), the prosecutor in his closing statement commented on the petitioner's unsworn statement:

[PROSECUTOR]: . . . Our 23 witnesses testified under oath. They had 10 witnesses that testified under oath, and do you think it's important as to the effect of his

asked the jury why Mr. DePew did not call certain witnesses. The prosecutor also convinced the trial court to admit into evidence a picture of Mr. DePew standing next to a marijuana plant, and later referred to it in closing argument. Finally, the prosecutor commented in closing argument that if Mr. DePew had taken the stand, the prosecutor would have asked him "if he's ever been convicted of a criminal offense after the date in question in this case." After hearing these statements, the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and recommended a sentence of death. The trial court made its required independent determination and then adopted the jury's recommendation, sentencing the defendant to death.

The defendant appealed to the Butler County Court of Appeals, which affirmed his conviction and sentence. *State v. DePew*, No. CA85-07-075, 1987 WL 13709 (Ohio App. June 29, 1987). In the defendant's subsequent appeal, the Ohio Supreme Court found, as previously stated, that the prosecutor's actions constituted "unreasonable and unfair conduct," but upheld the death sentence. *State v. DePew*, 38 Ohio St. 3d at 288, 528 N.E.2d at 556.

After exhausting his direct appeals, the defendant filed an action in the Butler County Court of Common Pleas requesting post-conviction relief pursuant to Ohio Rev. Code § 2953.21. The court denied his request without an evidentiary hearing, and the defendant's subsequent appeal to the Butler County Court of Appeals was also affirmed. *State v. DePew*, No. CA90-09-187, 1992 WL 193691 (Ohio App. Aug. 10, 1992). The Ohio Supreme Court dismissed defendant's request for further appeal and overruled his jurisdictional motions. *State v. DePew*, 65 Ohio St. 3d 1475, 604 N.E.2d 167 (1992).

The defendant then filed a second request for post-conviction relief under Ohio law. After conducting discovery, the defendant's request for relief was denied. The Butler County Court of Appeals affirmed, as did the Ohio Supreme Court. *State v. DePew*, 97 Ohio App. 3d 111, 646 N.E.2d 250

(1994), *appeal not allowed*, 71 Ohio St. 3d 1444, 644 N.E.2d 407 (1995). In addition, the defendant's two requests to reopen his direct appeal were denied. *State v. DePew*, No. CA85-07-075, 1994 WL 178405 (Ohio App. May 9, 1994), *aff'd*, 70 Ohio St. 3d 1435, 638 N.E.2d 1039 (1994); *State v. DePew*, 70 Ohio St. 3d 1219, 640 N.E.2d 840 (1994).

After exhausting his state remedies, the defendant initiated this action, requesting a writ of habeas corpus pursuant to 28 U.S.C. §2254. The defendant raised thirteen claims of error which both parties stipulate have not been procedurally defaulted. The magistrate judge issued a report and recommendation suggesting that the district court grant the writ on the basis of the defendant's claims of prosecutorial misconduct at sentencing, and deny the remainder of the defendant's claims. The district court judge agreed and issued the writ on the grounds recommended by the magistrate judge. *DePew v. Anderson*, 104 F. Supp. 2d 879 (S.D. Ohio 2000).

Because the defendant's habeas petition was filed prior to April 24, 1996, when the Antiterrorism and Effective Death Penalty Act ("AEDPA") became effective, AEDPA provisions do not apply to his case. We therefore review the district court's grant of habeas corpus relief *de novo*. *See, e.g., West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

## II.  Analysis

The Supreme Court has clearly established that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Lockett*, 438 U.S. at 604 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). This means that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

the jury aware that he smoked marijuana and did speed (and hence the jury knew he was not perfectly law-abiding); the comment was isolated; the prosecutor did not state outrightly that DePew had a subsequent conviction; defense counsel objected immediately; the judge gave a curative instruction to the jury; and the prosecutor then retracted the statement, telling the jury, "I wish you would just forget that because there's nothing like that here." J.A. at 4125.

Against all of these incidents, we must consider "the strength of the competent proof to establish the guilt of the accused." *Angel*, 682 F.2d at 608. Here, of course, we must apply that standard to the penalty phase of the trial, *see Roe v. Baker*, 2002 WL 31426248, at *6–8 (6th Cir. 2002), where that proof was considerable: DePew confessed to all three murders, there was overwhelming evidence of the aggravating factors, and the murders were unquestionably brutal. Putting all of this together, I would find that the prosecutors' conduct was not "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial," *Pritchett*, 117 F.3d at 964 (quoting *United States v. Thomas*, 728 F.2d 313, 320 (6th Cir. 1984)), nor was it "so egregious as to render the entire trial fundamentally unfair." *Id*. (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

I also take issue with the majority's finding that the prosecutor's comment on the unsworn nature of DePew's statement amounted to a violation of his right not to be "compelled . . . to be a witness against himself." U.S. CONST. amend. V. In *Griffin v. California*, 380 U.S. 609 (1965), the Court held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id*. at 615. The Sixth Circuit has additionally held that "indirect references on the failure to testify also can violate the Fifth Amendment privilege," *Byrd*, 209 F.3d at 533, and in such cases "a reviewing court must look at all the surrounding circumstances in determining whether or not

majority's focus is not on the prosecutor's comment—that DePew was "[g]rowing a little grass there you see"—but on what it views as an improper attempt by the prosecutor to cast doubt on DePew's assertions that he had a law-abiding past, *see ante*, at 10. In fact, however, the jury learned from DePew himself—in his taped confession, which the majority correctly holds was properly admitted and played for the jury during the guilt phase of his trial—that he was no stranger to the use of illegal drugs:

> Q [by Detective Sizemore]: You, Theresa [Jones], Tony [Jones] and Debbie [Sowers], did you ever do any dope together?
> A: Yes, we smoked marijuana.
> Q: Anything else?
> A: Tony would get some speed once in a while, Black Beauties I believe they were called. And as far as I know, that's all.

J.A. at 3785. In other words, long before the prosecution introduced the photograph, which merely showed DePew *standing* next to a marijuana plant, the jury knew that DePew had *used* both marijuana and speed. Hence it is unlikely that either the photograph or the comment was prejudicial.

Finally, there is the prosecution's closing-argument statement that if DePew had made a sworn, rather than an unsworn statement, "I would ask him if he's ever been convicted of a criminal offense after the date in question in this case." Though the prosecution was referring to a real event—between the time of the murders and his arrest, DePew had been convicted of knowingly receiving stolen property—only convictions prior to the date of the murders were admissible under Ohio law to refute DePew's claim in mitigation that he had no prior criminal record, *see* OHIO REV. CODE ANN. § 2929.04(B)(5), and any reference to this subsequent criminal activity would not have been proper even in impeachment, had DePew chosen to testify under oath. In my opinion, the comment, although certainly improper, was not highly prejudicial: DePew's confession had already made

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*

This consideration of mitigating factors -- required by the Eighth Amendment -- is necessary to allow the required individualized determination of whether a defendant should be sentenced to death. *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994); *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983). The Supreme Court's "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

The Eighth Amendment mitigation requirement also applies to the actions of prosecutors. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985) (a prosecutor's comments that led the jury to believe that later an appellate court could mitigate the death sentence violates the Eighth Amendment because it misleads the jury as to its responsibility). When a prosecutor's actions are so egregious that they effectively "foreclose the jury's consideration of . . . mitigating evidence," the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. *Buchanan*, 522 U.S. at 277. As a result, a prosecutor's comments violate the Eighth Amendment when they are so prejudicial as to "constrain the manner in which the jury was able to give effect" to mitigating evidence. *Id.*

In the case at bar, the sole mitigating factor offered by the defendant was his law-abiding past and his reputation as a peaceful person. To substantiate his mitigation theory, he put on twenty witnesses, all of whom extensively testified to the strength of his character and his peaceful demeanor. Each of the prosecutor's improper comments, however, was designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration.

First, the prosecutor asked a defense witness on cross-examination whether he was aware of the defendant's involvement in a knife fight at a convenience store. This highly prejudicial question which had no basis in fact (the

defendant had in reality been attacked), as the Ohio Supreme Court recognized, seriously undermined the defendant's proof that he was not a violent person. The question about the knife fight was particularly inflammatory because it involved the same violent act of which the defendant had been convicted -- stabbing with a knife.

Further eviscerating the defendant's attempt to present mitigating evidence was the prosecutor's presentation of an irrelevant photograph of the defendant standing next to a marijuana plant. When offering this photograph into evidence, the State did not offer any authentication or foundation to show that the person in the photograph was the defendant, that the photograph was real (and not doctored), or provide any background as to the circumstances under which the photograph was taken. The admission of this photograph raised unsubstantiated questions about the defendant's criminal history, threatening his assertions of having a law-abiding past.

Finally, the prosecutor stated in his closing argument that the defendant failed to take the stand in order to prevent the prosecutor from asking him whether he had a subsequent conviction. This improper statement also undermined defendant's theory that he was a law-abiding citizen, implying that the defendant was instead a recidivist continually engaged in criminal conduct.

The factors to be considered when analyzing a claim of prosecutorial misconduct are:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc).

---

consider each of these in turn, keeping in mind the factors we employ in determining whether a prosecutor's comments rise to the level of prosecutorial misconduct:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Angel*, 682 F.2d at 608 (quoting *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)).

Regarding the reference to DePew's getting "cut in a knife fight," though the question as phrased by the prosecutor did improperly insinuate that DePew was the aggressor, the defense immediately objected, the trial court immediately issued a curative instruction, and nothing more was ever said of the matter. The prosecutor later explained to the judge that he had learned from Detective Sizemore that DePew had been stabbed because of a drug-related quarrel, and he had intended to present witnesses to the incident but had been unable to locate them. *See* J.A. at 3957–58. Consequently, though the remarks tended to mislead the jury into thinking that DePew had actually fought with a knife, and this undermined his theory of mitigation, the event was isolated, the judge "cured" it, and the prosecutor had apparently intended to introduce witnesses who could back up the reference.

Next is the introduction of a picture of DePew standing next to what was apparently a marijuana plant, and the prosecutor's reference to it in closing-argument. The

---

§ 2929.41; *see also State v. Allard*, 663 N.E.2d 1277, 1287 (Ohio 1996) (holding that "since a jury has no option of recommending whether life sentences should run consecutively or concurrently," it was proper for the trial court to instruct the jury that "[y]ou are not to speculate as to what sentence the Court is actually going to impose or whether the sentences will be run concurrent or consecutive.").

only is this approach unprecedented, it is unnecessary, and it invites confusion.[1]

I would hold that on the facts of this case, the prosecutor's comments did not rise to the level of a constitutional violation. This is, after all, a high standard: "even if the prosecutor's conduct was undesirable or even universally condemned, it does not constitute a due process violation unless the conduct was so egregious as to render the entire trial fundamentally unfair." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (internal quotation marks and citations omitted). The majority discusses three instances of alleged misconduct on the part of the prosecutor in this case: the reference to the knife fight, the use of the photograph of DePew standing next to a marijuana plant, and the reference to DePew's prior conviction.[2]   *See ante*, at 9–10.   I will

---

[1] What, for example, are we to make of the majority's proposition that "improper comments of a prosecutor . . . warrant automatic reversal . . . [where, as here] they go to the heart of the defendant's sole mitigating theory"? *Ante*, at 11. This would seem to suggest that harmless error review is not necessary in such cases, but this would be contrary to precedent. *See Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) ("This court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt."). In fact, the majority does discuss the issue of harmless error later, and appears to apply that analysis to its Eighth Amendment holding, *see ante*, at 13–14, but this nevertheless leaves one wondering what "automatic reversal" means. The statement now enters our case law, to be cited out-of-context in petitioners' briefs, until some future panel gives it a new, independent life.

[2] The majority also refers, in passing, *see ante*, at 3 and 6, to the prosecutor's comment that "[i]t's not necessarily true that if you get three counts of twenty to life that it will add up to sixty—that's not necessarily true." This issue, however, was first raised by defense counsel, who (in his sentencing phase closing argument) uttered a similar half-truth—assuring the jury that DePew would at the very least receive a sentence of 60 years, and consequently "[n]o matter what your verdict is, he will never be outside prison walls in his life." J.A. at 4073. In fact, it was up to the judge whether to run DePew's sentences consecutively or concurrently, and if the jury had imposed 20-year minimum sentences, the judge could have run them concurrently. *See* OHIO REV. CODE ANN.

Here, the question before the jury was whether the aggravating circumstances presented by the State outweighed the defendant's mitigating evidence. As stated previously, it is clear that the prosecutor's remarks unfairly undercut the only potential mitigating circumstance presented by the defendant: his peaceful and law-abiding past. These statements were purposefully placed before the jury and were not isolated; they clearly misled the jury and prejudiced the defendant; and they undermined the jury's ability to make a fair determination as to whether the defendant's proffered character outweighed the aggravating factors proved against him.

As the district court held, these improper statements, particularly when taken together, were designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant. While improper comments of a prosecutor do not generally warrant automatic reversal, the statements in the case at bar require it because they go to the heart of the defendant's sole mitigating theory. Allowing the prosecutor to make inadmissible, inflammatory — and in the words of the Ohio Supreme Court, "misleading" — statements which directly undercut the defendant's sole theory of mitigation effectively undermines the defendant's right under the Eighth Amendment to receive the "constitutionally indispensable" consideration of his proffered mitigating evidence. *Lockett*, 438 U.S. at 604; *see also Caldwell v. Mississippi*, 472 U.S. 320 (1985) (applying stricter standards for assessing validity of prosecutorial closing arguments in capital cases than in noncapital cases). Thus, we remand the case for resentencing based on this constitutional error.

The prosecutor's statement concerning the defendant's refusal to testify at sentencing also violated the defendant's Fifth Amendment rights as set forth in *Griffin v. California*, 380 U.S. 609 (1965). At oral argument, defense counsel stated that he would waive the claim of Fifth Amendment

error.[1]  Upon an independent examination of the record, we find that, contrary to counsel's belief, the defendant has a viable Fifth Amendment claim.  On direct appeal the Ohio Supreme Court decided this very question, holding that the prosecutor's remarks at trial violated the Fifth Amendment, but constituted harmless error.  *State v. DePew*, 38 Ohio St.3d at 285, 528 N.E.2d at 554.  In addition, the defendant raised the issue in his first ground for habeas relief in his Amended Petition:

> First Ground for Relief: The death sentence imposed on Petitioner is unreliable because the government so infected the trial with unfairness as to deny Petitioner a fair trial guaranteed by the **Fifth**, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Emphasis added.)    As a result, we disregard defense counsel's waiver of the Fifth Amendment claim.

As a general matter, a comment by the prosecution on a defendant's failure to testify violates the Fifth Amendment. *Griffin v. California*, 380 U.S. 609 (1965).  Under Ohio's

---

[1]Counsel's failure to argue an obvious constitutional error to assist his client is an example of errors by counsel that have repeatedly infected death penalty cases.  *See Bell v. Cone*, 122 S. Ct. 1843, 1863, n.17 (2002)((Stevens, J., dissenting)(noting that members of the Supreme Court have recognized both the importance of qualified counsel in death penalty cases, and the frequent lack thereof)(citing *McFarland v. Scott*, 512 U.S. 1256 (1994)(Blackmun, J., dissenting from denial of certiorari) (describing the "crisis in trial and state postconviction legal representation for capital defendants")); Charles Lane, *O'Connor Expresses Death Penalty Doubt; Justice Says Innocent May Be Killed*, Washington Post, July 4, 2001, at A1 (reporting Justice O'Connor's comment that "[p]erhaps it's time to look at minimum standards for appointed counsel in death cases" and Justice Ginsburg's comment that "I have yet to see a death case, among the dozens coming to the Supreme Court on the eve of execution petitions, in which the defendant was well represented at trial"); *see also* J. Liebman, *et al.*, A Broken System, Part II: Why There Is So Much Error in Capital Cases, and What Can Be Done About It, 405-06 (Feb. 11, 2002).

*court* violated [the petitioner's] Eighth and Fourteenth Amendment rights to be free from arbitrary and capricious imposition of the death penalty when it failed to provide the jury with express guidance on the concept of mitigation, and to instruct the jury on particular statutorily defined mitigating factors," *Buchanan*, 522 U.S. at 275 (emphasis added), questions which the Court answered in the negative. *Buchanan* did not—contrary to the majority opinion's assertion—hold that the Eighth Amendment mitigation requirement applies to the actions of prosecutors, and the majority's citation to it for that proposition is improper.

The proper inquiry, where a petitioner alleges prosecutorial misconduct, is (to quote DePew's own brief) "whether the comments so infected the trial with unfairness as to make the resulting sentence a denial of *due process*."  Final Brief at 23 (emphasis added); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The majority—in holding that DePew should be resentenced because the prosecutor's alleged misconduct "effectively undermine[d] the defendant's right under the Eighth Amendment to receive the 'constitutionally indispensable' consideration of his proffered mitigating evidence," *ante*, at 11—thus constructs a constitutional ground neither alleged by DePew, nor (so far as I have been able to find) previously recognized by any other court.

I think this court should confine itself to the standard due process analysis used where prosecutorial misconduct is alleged.  Though the majority does consider the recognized prosecutorial misconduct factors, *see ante*, at 10 (citing factors from *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)), the ground of its decision nevertheless remains the Eighth Amendment right to present mitigating evidence. Not

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting. Because I believe that the majority improperly extends and applies our prosecutorial misconduct and self-incrimination jurisprudence, I respectfully dissent from the majority opinion's reasoning and conclusions resulting in the granting of the writ of habeas corpus with regard to the death penalty.

First, I take issue with the majority's pronouncement that

[t]he Eighth Amendment mitigation requirement also applies to the actions of prosecutors. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985) . . . . When a prosecutor's actions are so egregious that they effectively "foreclose the jury's consideration of . . . mitigating evidence," the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. [*Buchanan v. Angelone*, 522 U.S. 269 (1998)] at 277. As a result, a prosecutor's comments violate the Eighth Amendment when they are so prejudicial as to "constrain the manner in which the jury was able to give effect" to mitigating evidence. *Id.*

*Ante*, at 9. Neither this statement of the law nor the attribution of it to *Caldwell* and *Buchanan* is well-founded. *Caldwell* found that a prosecutor's statements can violate the Eighth Amendment; it did not find that "[t]he Eighth Amendment *mitigation requirement* also applies to prosecutors." *Id.* (emphasis added). *See Caldwell*, 472 U.S. at 328–29 (concluding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). Likewise, *Buchanan* did not concern or address any instance of alleged prosecutorial misconduct. Rather, the issue there was whether "the *trial*

unique statutory scheme, a defendant may present an unsworn statement at sentencing without subjecting himself to cross-examination. Ohio Rev. Code §2929.03(D)(1). We agree with the Ohio Supreme Court that "to permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights." 38 Ohio St. 3d at 285, 528 N.E.2d at 554. It was a direct comment on the refusal of the defendant to testify under oath and subject himself to cross-examination — a clear, though perhaps unpopular, right of a defendant in a criminal case under the Fifth Amendment. The prosecutor asked the jury to draw an adverse inference from the defendant's failure to testify.

The Supreme Court of Ohio did not precisely hold all of these manifold errors to be "harmless." Rather, it said that the crime was "brutal" and that reversal of the death penalty on these grounds violated the "interest of the public, which has every right to expect its criminal justice system to work effectively." 38 Ohio St. 3d at 288, 528 N.E.2d at 557. This is not the proper constitutional definition of harmless error. The public's, or the voter's, feelings in favor of capital punishment for brutal crimes are a well-known part of our political tradition, but these feelings cannot rise above or displace constitutional provisions insuring a fair trial.

Members of the Supreme Court have advised us to remember that "death is different" -- that "[t]he taking of life is irrevocable," so that "[i]t is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights," *Reid v. Covert*, 354 U.S. 1, 45-46 (1957) (Frankfurter, J., concurring), and that "[i]n death cases doubts . . . should be resolved in favor of the accused." *Andres v. United States*, 333 U.S. 740, 752 (1948). In *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985), the Court decided that a prosecutor's prejudicial statements in closing argument rendered the death sentence invalid. It applied a stricter standard in assessing the validity of closing argument in death cases relying on the Court's admonition in *California v.*

*Ramos*, 463 U.S. 992, 998-99 (1983), that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny in capital sentencing determinations."

Cumulatively, it is clear that these errors are not harmless. As adopted by Justice Stevens in his authoritative concurrence in *Brecht v. Abrahamson*, 507 U.S. 619, 641 (1993); *see also O'Neal v. McAninch*. 513 U.S. 432 (1995), the applicable standard of harmless error requires that if "one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Because we have "grave doubt" that the statements by the prosecutor did not have an effect on the sentencing of the defendant, we find that the constitutional errors in this case are not harmless, and accordingly, we grant defendant a new penalty phase on the above stated grounds.

### III.  Other Issues

Because we are ordering a new sentencing phase on Eighth and Fifth Amendment grounds, we do not reach the alternate grounds raised by defendant in his brief that challenge his death sentence, including juror confusion (third ground), the failure to excuse jurors for cause (fourth ground), ineffective assistance of counsel (eighth ground), the failure to provide for a verbatim transcript of the trial proceedings (ninth ground), the admission of certain photographs (tenth ground), the admission of privileged communications with defendant's common-law spouse (eleventh ground) and the cumulative effect of the trial errors (twelfth ground).

Defendant also raises two other issues that he claims warrant a granting of the writ and a new trial: (1) defendant's trial was fundamentally unfair, and the trial court's factual findings are not entitled to the usual presumption of correctness, particularly the findings in the denial of defendant's motion to suppress, and (2) defendant's confession should not have been introduced at trial because it

an unconditional writ, vacating the death sentence. However, as recognized by the district court judge in his order, the matter of resentencing is for the courts of Ohio to address and we leave resolution of the state question for them.

For the foregoing reasons, the judgment of the district court is affirmed in part as to the vacating of the death sentence, reversed in part as to the grant of an unconditional writ  and remanded with instructions to conditionally grant the writ unless the State of Ohio elects to initiate resentencing proceedings within 180 days of the district court's order.

a lawyer in his presence. Judge Moser was the trier-of-fact deciding between two somewhat differing accounts of what transpired. He heard the testimony first-hand, saw the witnesses and decided that Mr. DePew did not ask the police for a lawyer during questioning. The trial judge found that while defendant may have said he wanted a lawyer in the presence of his relatives, he never told the police that he wanted a lawyer. Judge Moser denied the motion to suppress in a detailed opinion that is free of constitutional error on this issue.

Defendant also contends that his testimony was coerced after hours in the prosecuting attorney's office. While Mr. DePew was questioned in the district attorney's office instead of the police station, which is uncommon but not unheard of, the record does not indicate that his confession was in any way coerced. During the course of his detention, defendant read and signed a waiver of his *Miranda* rights. He does not claim to have been mistreated in any way. We find no evidence of coercion in the record before us.

Judge Moser's opinion regarding the motion to suppress details the reasons why he denied the motion. The opinion is supported by the evidence, and, as recognized by Judge Moser, the two sets of facts can be reconciled. The crux of defendant's complaint about the admission of his confession rests primarily on his claim of judicial bias, which, as described above, is troublesome but not a basis for upsetting the verdict finding him guilty of murder.

## Conclusion

As a general rule, the relief given in a federal habeas case challenging a death sentence is a conditional order vacating the sentence unless the defendant is resentenced within a set period of time, usually 180 days. The magistrate judge herein recommended such a conditional order, but the district court judge did not adopt that recommendation because the law of Ohio, as it existed when defendant committed the crimes herein, did not allow imposition of the death penalty upon resentencing. On that basis, the district court instead granted

was obtained in violation of his right to counsel under *Miranda v. Arizona*, 384 U.S. 436 (1966), and it was not obtained voluntarily due to bias by the trial judge.

### A.  Judicial Bias

Defendant claims that he did not receive a fair trial due to bias on the part of Judge Moser, the state court judge who presided over his trial. The bias charge stems largely from a series of newspaper articles in which Judge Moser was quoted and a letter that Judge Moser wrote to the local newspaper in connection with a different murder case in Butler County. In that case, Judge Moser was one member of a three-judge panel where the defendant received life imprisonment with the possibility of parole in 20 years rather than the death penalty. Some members of the public perceived the sentence to be too lenient and severely criticized the judges involved. Many of the public statements made by Judge Moser on which Mr. DePew rests his claim of judicial bias were in response to the public outcry and criticism of the judges concerning this other case. The articles and letters first appeared in the paper before Mr. DePew's trial began and continued after it started. In a letter written by Judge Moser to a local newspaper, he blamed the Ohio Legislature for the sentence, saying it had put too many impediments in the way of prosecuting death penalty cases. In connection with the DePew case, Judge Moser was quoted in the newspaper after he denied Mr. DePew's motion to suppress, saying that "no trial judge enjoys putting an alleged killer back into society on a technicality. If I have doubt, I'm giving the benefit of the doubt to the law enforcement officers."

Based on Judge Moser's public statements and letter, defendant contends that Judge Moser's findings of fact, particularly those relied upon in deciding the motion to suppress, were not based on the evidence before the judge and his reasoned deliberation, but instead resulted from political pressure and caving to public sentiment. Defendant argues that because of this alleged judicial bias, his entire trial was infected and we should not give Judge Moser's factual

findings the usual deference accorded to them by federal habeas courts.

We recognize the political realities that Judge Moser faced in the form of a contested race for reelection when he wrote the letter blaming the legislature for any perceived deficiencies in death penalty sentencing. Such shifting of blame for unpopular decisions is common during contested elections. The statement was merely a political response by a judge facing an election, and we do not believe it indicates that Judge Moser could not or would not render decision based on the law and the evidence before him in a specific case.

We find more troubling Judge Moser's quote in the newspaper, made after the decision to deny defendant's motion to suppress, stating that he would side with law enforcement when in doubt. Judge Moser improperly commented on a specific case pending before him, making it appear as though he may have sided with the police instead of looking to the facts when deciding defendant's motion to suppress, as well as calling into question his impartiality in handling the trial, which was still to come. Although it is certainly unfortunate that the judge felt it expedient to make such public statements concerning a pending case, we find that no actual judicial bias infected defendant's trial or any of the trial court's rulings in his case. A review of the record in this case demonstrates that Judge Moser's decision to deny the motion to suppress the confession was based on sufficient evidence, as set forth in his opinion on the matter and discussed in Part B below. Judge Moser's imprudent statement does not make his decision in this case biased *per se* or his factual findings clearly erroneous.

Although we reject this ground for issuing the writ, we do so in light of the fact that we have already set aside the death sentence. But we are troubled by what happened here. Judge Moser was caught in a system that requires elected judges, subject to the prevailing political winds, to preside over capital cases. This episode serves as one more example of the

problems faced by elected state court judges who must make unpopular decisions in order to uphold the rights of defendants before them and then be branded as "soft on crime" by opponents and reviled by the public when they come up for reelection. In a system that relies on elected judges to hear, decide and review death penalty cases, the federal courts must be conscious of the intense political pressures our state colleagues are facing and remain especially vigilant in enforcing the procedural rights accorded the accused by the Bill of Rights. See a discussion of this problem in James S. Liebman, *The Overproduction of Death*, 100 Colum. L. Rev. 2030, 2111-14 (2000), and Stephen B. Bright & Patrick J. Keenan, *Judges and the Politics of Death: Deciding Between the Bill of Rights and the Next Election in Capital Cases*, 75 B.U. L. Rev.759 (1995).

### B. Introduction of Confession at Trial

Defendant was convicted in large part based on his confession to the police that he committed the murders, which he made after he had been arrested on an outstanding warrant for a different crime. Mr. DePew contends that his confession was not voluntary, was obtained in violation of his right to counsel and in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). At the hearing on the motion to suppress, the trial court heard two different accounts of what transpired after defendant's arrest. Mr. DePew and several defense witnesses testified that Mr. DePew made a request for a lawyer to the police. The two detectives testified that they did not hear him make such a request in their presence.

A review of the trial court's decision denying the motion to suppress, however, contrary to Mr. DePew's contention, is supported by the evidence from the suppression hearing. We will not review all the facts here, but simply put, defendant claims that the arresting detectives knew he wanted a lawyer and questioned him anyway. One officer testified that he could not recall defendant asking for a lawyer, and the other officer testified unequivocally that defendant did not ask for